## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Ryan Smith, individually and on behalf of all others similarly situated, | 6:22-cv-788 (BKS/ML) |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Adidas America, Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.      Adidas America, Inc. ("Defendant") manufactures, labels, markets, and sells NHL (National Hockey League) jerseys represented as "authentic" under the Adidas brand (the "Product").

## I.      SPORTS MERCHANDISE

2.      The retail sales of sports teams' licensed merchandise in the United States and Canada exceeds $20 billion per year.

3.      This generates millions of dollars for teams through royalties and is an increasingly important revenue source.

4.      Commitment to a particular sports team "crosses many areas of society such as wealth, position, race, and religion."[1]

5.      The most significant – and expensive – of such merchandise is the team jersey, often bearing the name of the wearer's favorite player.

---

[1] Norm O'Reilly, et al., "Merchandise sales rank in professional sport: Purchase drivers and implications for National Hockey League clubs," Sport, Business and Management: An International Journal (2015).



6.      The jersey signifies the fan's loyalty to his or her team and provides an opportunity to enhance a relationship with the club.

7.      When fans decide to purchase a jersey, they have multiple options.

8.      National retailer Dick's Sporting Goods identified the three types of hockey jerseys as Authentic, Official, and Replica.[2]

9.      According to Dick's, "Not all jerseys are cut from the same cloth," because "Some might be designed for in-game action, while others are best suited for your gameday party."

10.     By knowing the "differences between authentic and replica jerseys," fans can "match [their] gear to [their] needs."

11.     Hockey jerseys identified as "authentic" "are the on-ice apparel worn by your favorite professional team."

---

[2] Authentic vs. Replica Jerseys: What's the Difference?, Pro Tips, Dick's Sporting Goods.

12. This is consistent with historical usage and understanding, because for decades, "authentic" in the context of NHL jerseys referred to jerseys worn on the ice by NHL players.

13. There are several distinct criteria to identify authentic hockey jerseys.

14. First, authentic hockey jerseys have "a tailored fit and premium fabric."

15. Second, "An easy way to identify authentic hockey jerseys is the included fight strap. This is the added fabric that helps players keep their sweater from being pulled over their eyes during a scrum."

16. Third, authentic hockey jerseys use "moisture-wicking technologies to keep fans dry whether on the ice or in the stands."

17. Fourth, authentic hockey jerseys have "Twill numbers and lettering," indicative of their "premium craftsmanship."

18. In contrast to authentic hockey jerseys, replicas "often feature screen printed or iron-on letters and numbering" and "use[s] lesser grade fabrics."

19. Dick's recommends that replicas "can be good for fans wanting apparel *resembling* pro-grade without breaking the bank." (emphasis added).

## II.  DEFENDANT'S JERSEYS ARE MISLEADINGLY IDENTIFIED AS "AUTHENTIC"

20. Consumers purchasing NHL jerseys marketed as "authentic" by the company which makes the jerseys worn by NHL teams, will expect they are purchasing jerseys identical to those worn on the ice by NHL players.[3]

21. Defendant understands the differences between authentic and replica jerseys, and has stated that "a replica uniform will not be 'authentic' and, therefore, not desirable to consumers

---

[3] AJ Strong, Stop Calling Adidas NHL Jerseys Authentic, Teal Town USA, June 29, 2021.

unless it contains all the elements of the uniform worn in competition."

22.     On its website (below) and in digital, print, radio and/or television marketing, Defendant promotes the jerseys as authentic through labeling, hang tags, and descriptions.



23.     At the instructions and directions of Defendant, third-party stores and websites such as fanatics.com identify these jerseys as "authentic" by labeling them with names such as "Home Authentic Primegreen Jersey" and "Authentic Pro Player Jersey."



24.   Defendant capitalizes on consumers believing and expecting the jerseys are authentic, shown through their website description that "this jersey is the same as the one Oilers players wear when the puck drops on the road."[4]

**OILERS AWAY AUTHENTIC PRO JERSEY**

THE OFFICIAL AWAY GAME JERSEY OF THE EDMONTON OILERS.

Celebrate Edmonton hockey as they turn up the intensity away from home. Featuring an authentic tie-down fight strap with a hook-and-loop and snap closure, this jersey is the same as the one Oilers players wear when the puck drops on the road. The relaxed fit provides extra room.

---

[4] The representations for the team identified here are substantially similar or identical to those made for all NHL teams.



**OILERS AWAY AUTHENTIC PRO JERSEY**

*THE OFFICIAL AWAY GAME JERSEY OF THE EDMONTON OILERS.*

Celebrate Edmonton hockey as they turn up the intensity away from home. Featuring an authentic tie-down fight strap with a hook-and-loop and snap closure, this jersey is the same as the one Oilers players wear when the puck drops on the road. The relaxed fit provides extra room.

25.     That these jerseys are "the same as [] players wear" is presumably confirmed due to features which would only be relevant in on-ice jerseys, such as the "tie-down fight strap with a hook-and-loop snap closure."

26.     A "fight strap" refers to the attachment on a hockey jersey which keeps it on the wearer during a fight and prevents a player from having their jerseys pulled over their head, rendering them vulnerable to the opposing player.

27.     There is no reason to include a "fight strap" on a jersey that is not meant to be worn on-ice, because this is solely a utilitarian feature relevant to being on skates in a hockey fight.

28.     By emphasizing that the Product is made with a fight strap, consumers will expect it is identical to on-ice jersey.

29.     However, despite the representations as "authentic," the jerseys are not those worn on-ice by NHL players.

30.     First, the fight straps in the authentic and on-ice jerseys are different in quality.

31.     In the on-ice jersey, the fight strap contains a double layered reinforced base, while it is affixed through a single stitched layer in the authentic jersey sold to Plaintiff and consumers.

On-ice Jersey                    Authentic



32.    This is also seen on the jerseys, as the fight strap on the authentic jerseys (top) are

not as thickly or securely attached to the fabric as the on-ice jerseys (bottom).



33.    Second, the fabric in the authentic jerseys (top) is half the thickness of the fabric used

in the on-ice jerseys (bottom) worn by NHL players.



34.    While it is not possible to view the thickness side-by-side through the flat picture, the neck area of the authentic jerseys is noticeably thinner than the same area of the on-ice jerseys.

35.    Third, the stitching used in the authentic jerseys (left) is weaker and less durable than in the on-ice jerseys (right). worn by NHL players.



36.    In the authentic jerseys, the seam inside the red circle does not even look sewn together by stiches, compared to the same area in the on-ice jerseys, which shows multiple cross-stiches between the two parts of the jersey.

37.    Fourth, the neck hole in the on-ice jerseys (top) is smaller than in the authentic jerseys (bottom).



38.    Fifth, the "dimples" or small holes throughout the fabric are significantly distinct.



39.    In the on-ice jerseys (top), the dimples are significantly larger, because they were created through the machines which mechanically press the jersey.

40.    The dimples in the authentic jerseys (bottom) appear to have been added solely for aesthetics.

41.    This difference is relevant when it comes to the on-ice jerseys, because these small holes allow air to flow through the jersey.

42.    The smaller, almost imperceptible dimples in the authentic jerseys render them less efficient at dealing with moisture and airflow than the on-ice jerseys.

43.    Sixth, the logos, numbers, stripes, and names on the authentic jerseys are generally applied via heat pressing instead of the double-stitching on the on-ice jerseys.

44.    Seventh, the authentic jerseys are "Made in Indonesia" while the on-ice jerseys are "Made in Canada."

45.    Canada is generally considered a more technologically advanced nation than Indonesia, which produces higher quality garments and textiles.

46.    Canada is also "the Birthplace of [ice] hockey," where "[I]t originated around 1800" "in Windsor, Nova Scotia."[5]

47.    As the world leader – and inventor of hockey – Canada has institutional knowledge of all aspects of this winter sport, passed down through generations of craftsmen.

48.    In contrast, the tropical temperature of Indonesia has never been suitable for playing ice hockey.

49.    The relevance of the smallest details on a hockey jersey are more easily recognized in the place hockey was invented than anywhere else.

---

[5] Garth Vaughan, Origin Overview Quotes Prove Ice Hockey's Origin, 1999.

10

50.     The authentic jerseys (middle) are closer to counterfeit Adidas NHL jerseys (bottom) than to those worn on the ice by NHL players (top).



51.     The representation of the Product as "authentic" is misleading, because they are more accurately described as "replicas."

52.     Defendant makes other representations and omissions with respect to the Product which are false or misleading.

53.     The value of the jersey that Plaintiff purchased was materially less than its value as represented by Defendant.

54.     Defendant sold more jerseys and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

55.     Had Plaintiff and proposed class members known the truth, that the jerseys were not those worn on the ice by NHL players during games, they would not have bought the jerseys or would have paid less for them.

56.     As a result of the false and misleading representations, the Product is sold at a

premium price, approximately no less than no less than $179.99, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

57.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

58.    The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

59.    Plaintiff Ryan Smith is a citizen of New York.

60.    Defendant Adidas America, Inc. is an Oregon corporation with a principal place of business in Portland, Multnomah County, Oregon

61.    The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

62.    The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, in thousands of locations, in the states covered by Plaintiff's proposed classes.

63.    The Product is available to consumers from Defendant's retail stores and website, and third-party retail sporting goods stores and websites, such as the NHL's website and fanatics.com.

64.    Venue is in this District because a substantial part of the events or omissions giving rise to these claims, including Plaintiff's purchase and use/wearing of the jersey, awareness of the jersey's representation as authentic or identical to what NHL players wore during games, and his discovery these representations were false, occurred here.

Parties

65.     Plaintiff Ryan Smith is a citizen of Frankfort, Herkimer County, New York.

66.     Defendant Adidas America, Inc. is a Oregon corporation with a principal place of business in Portland, Oregon, Multnomah County.

67.     The parent company of Defendant is Adidas AG, a German multinational sportswear corporation, founded and headquartered in Herzogenaurach, Bavaria, in 1949.

68.     Adidas AG is the second largest sportswear company in the world, after Nike, with revenues approaching $30 billion.

69.     Adidas manufactures uniforms, including jerseys, for the National Hockey League.

70.     Consumers know they can trust a sportswear product with Adidas' well-known three stripes to deliver what it promises.

71.     The Product is available to consumers from Defendant's retail stores and website, and third-party retail sporting goods stores and websites

72.     Plaintiff purchased the Adidas authentic NHL jerseys described here within the statutes of limitations for each cause of action alleged, at stores and/or websites, including the website of Defendant, adidas.com and NHL.com, over the past three years, and/or among other times.

73.     Plaintiff believed the Product was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

74.     Plaintiff read, reviewed, and relied on Defendant's representations that the jerseys "[were] the same as the one[s] [Oilers] players wear when the puck drops" on the ice.

75.     Plaintiff was aware the jerseys had features such as an "authentic tie-down fight strap

with a hook-and-loop and snap closure," which serve no purpose in a jersey not designed and sold for use on the ice by NHL players.

76.     Plaintiff bought the Product because he expected it was authentic, and the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, because that is what the representations said and implied.

77.     Plaintiff relied on the words, descriptions, layout, tags, images, and website descriptions on Defendant's site and those of its third-party partners, about its authentic jerseys.

78.     Plaintiff was disappointed because he believed the Product was authentic, understood as being identical to that worn on the ice by NHL players during games.

79.     Plaintiff bought the Product at or exceeding the above-referenced price.

80.     Plaintiff would not have purchased the Product if he knew the jerseys were not identical to those worn on the ice by NHL players, or would have paid less for them.

81.     Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components, as those worn on the ice by NHL players.

82.     The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

Class Allegations

83.     Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Maine, Michigan, Idaho, Wyoming, Indiana, North Dakota and Nebraska, who purchased the Product during the statutes of limitations for each cause of action alleged.

84.    Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

85.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

86.    Plaintiff is an adequate representative because his interests do not conflict with other members.

87.    No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

88.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

89.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

90.    Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>General Business Law §§ 349 and 350</u>

91.    Plaintiff incorporates by reference all preceding paragraphs.

92.    Plaintiff purchased the Product believing it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

93.    Plaintiff relied on the representations on the websites of Defendant and third-party sellers who, at its directions, advertised the jerseys as authentic.

94.    Plaintiff read descriptions of the jerseys written by Defendant where it described the jerseys as identical to those worn on the ice by NHL players.

95.     Defendant's false and deceptive representations and omissions are material because they caused Plaintiff to spend more than he otherwise would have for its authentic jerseys.

96.     Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

97.     Plaintiff relied on the representations that the Product was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

98.     Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

99.     The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

100.    Defendant intended that each of the members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

101.    As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

102.    Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

103.   The Product was manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

104.   Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the jerseys, its ad text on its website and those of its third-party sellers, and targeted digital advertising.

105.   Defendant knew the product attributes that potential customers like Plaintiff were seeking – pro-stock, on-ice game-ready hockey jerseys with features like a fight strap, real pressed dimples, stitched logos, names, and numbers – and developed its marketing and labeling to directly meet those needs and desires.

106.   Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

107.   Defendant's representations affirmed and promised that the Product was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

108.   Defendant described the jerseys as one which was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit, which became part of the basis of the bargain that they would conform to those affirmations and promises.

109.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the jerseys.

110.  This duty is based on Defendant's outsized role in the market for NHL jerseys, the official manufacturer of the jerseys worn on the ice by NHL players, and known as a leader in sportswear.

111.  Plaintiff recently became aware of Defendant's breach of the Product's warranties.

112.  Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

113.  Plaintiff hereby provides notice to Defendant that it has breached the express and implied warranties associated with the Product.

114.  Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

115.  Defendant was notified by several sources.

116.  First, a website devoted to covering the San Jose Sharks, TealTownUsa.com, published an article by AJ Strong, entitled, "Stop Calling Adidas NHL Jerseys Authentic," in June 2021.

117.  Strong provided detailed facts about why "it's disingenuous and misleading for Adidas to call [the jerseys] 'authentic' or 'authentic pro'" and recommended "Adidas [] call[s] those jerseys what they are… replicas."

118.  Strong also notified Adidas that the price of c. $179 was $50 greater than what comparable replica NHL jerseys are sold for.

119.  Six months later, another fan of the San Jose Sharks, the well-known memorabilia

and video game blogger known as "REZRECTION," notified Adidas of similar issues identified by Strong.

120.  Rezrection posted a video to his YouTube channel entitled, "Do Not Buy Adidas NHL Authentic Hockey Jerseys Before Watching This Video! What You Need To Know!"

121.  During Rezrection's nine minute video, he isolated numerous ways in which the authentic Adidas NHL jerseys were deficient compared to the on-ice jerseys.

122.  Rezrection cautioned his viewers to be careful about paying almost as much for the authentic jerseys as the on-ice jerseys would cost, given what he described as stark differences in quality.

123.  Adidas, like most large companies, regularly monitors social media for mentions of its brand, and was informed, directly or through its agents, of the issues identified by Strong and Rezrection.

124.  The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

125.  The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, which described it as "authentic" and the same jerseys worn on the ice by NHL players.

126.  The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it was authentic, and was the jersey worn by NHL players during hockey games, and he relied on Defendant's skill and judgment, as the company which manufactures the jerseys worn on the ice by NHL players during games, to select or furnish such a suitable product.

19

127.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

128.   Defendant had a duty to truthfully represent the Product, which it breached.

129.   This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the official manufacturer of NHL jerseys, and known as a leader in sportswear.

130.   Defendant's representations regarding the Product went beyond the specific representations affixed to the jerseys and describing them on its own websites and those of its third-party sellers, as they incorporated its extra-labeling promises and commitments to quality, as the manufacturer of actual on-ice NHL jerseys

131.   These promises were outside of the standard representations that other sports apparel companies may make in a standard arms-length, retail context.

132.   Defendant capitalized on the intense connection that fans like Plaintiff have with their favorite hockey team to entice them to buy – and wear – the same jerseys worn by their favorite players during NHL games.

133.   The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

134.   Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

135.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

136.   Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was authentic, understood as being the same jersey that NHL players wear during hockey games, from the fight strap to the dimples to the stitching and the fit.

137.   Defendant understands the differences between authentic and replica jerseys, and has stated that "a replica uniform will not be 'authentic' and, therefore, not desirable to consumers unless it contains all the elements of the uniform worn in competition."

138.   Defendant was aware of the distinctions between replica and authentic jerseys due to its history and involvement as a producer of jerseys for the NHL and other athletic leagues.

139.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity or deception, through statement and omission, of the representations.

140.   Defendant knew of the issues described here yet did not address them.

141.   Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations, because it was made from different materials, using different methods, which resulted in jerseys of lower quality than those worn on the ice by NHL players.

Unjust Enrichment

142.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and the

undersigned as counsel for the class;

2. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   July 26, 2022

                                        Respectfully submitted,

                                        /s/Spencer Sheehan
                                        Sheehan & Associates, P.C.
                                        Spencer Sheehan
                                        60 Cuttermill Rd Ste 412
                                        Great Neck NY 11021
                                        Tel: (516) 268-7080
                                        spencer@spencersheehan.com